(92 Misc. Rep. 607)

### SMITH v. BOARD OF CANVASSERS OF ONEIDA COUNTY.

(Supreme Court, Special Term for Motions, Oneida County. December 27, 1915.)

1. Elections ⬚259—Opening Voting Machines—Power of Board of Canvassers—Statute—"Discrepancy."

   Election Law (Consol. Laws, c. 17) § 416, is headed "Provision for Re-Canvass of Vote," and provides that, whenever it shall appear that there is a discrepancy in the returns of any election district, the county board of canvassers shall summon the inspectors of election, and the inspectors, in the presence of the board, or a bipartisan committee, shall make a record of the number on the seal of the voting machine, and the number of the protective counter, if one is provided, open the counter compartment, and, without unlocking the machine against voting, shall recanvass the vote cast thereon. The returns, from voting machines used in various districts, and the tally sheets, did not show the same number of votes, and, upon the board of canvassers proposing to open the machines, a candidate sought to restrain them. *Held*, that the board, though a ministerial body and without judicial power, had the right to open the machines, since it is the sworn duty of the board to obtain corrections of returns submitted to them, while "discrepancy," meaning discord, discordance, dissonance, dissidence, unconformity, disagreement, difference, also means the situation presented where an alleged election return does not conform to what the statute requires, thus amounting to a lack of conformity, or unconformity.

   [Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 234, 235; Dec. Dig. ⬚259.]

2. Elections ⬚259—Examination of Voting Machines—Statute.

   Under Election Law, § 416, providing that whenever it shall appear that there is a discrepancy in the returns of any election district the county board of canvassers shall summon the inspectors of election, and the inspectors, in the presence of the board, or a bipartisan committee, shall make a record of the number on the seal of the voting machine and the number of the protective counter, if one is provided, open the counter compartment, and, without unlocking the machine against voting, shall recanvass the vote cast thereon, if a discrepancy between the returns

of a voting machine and the tally sheet can be cleared up without unlocking the machine, it should not be unlocked, but if, after an inspection of the public counter, a discrepancy still exists, after examination of the counter compartment, the canvassers may unlock the voting and counting mechanism and test it.

[Ed. Note.—For other cases, see Elections, Cent. Dig. §§ 234, 235; Dec. Dig. ⊕═259.]

Special proceeding by James D. Smith to restrain the Board of Canvassers of Oneida County from opening voting machines. On motion to dissolve a temporary injunction. Injunction dissolved.

This is an alleged special proceeding instituted by James D. Smith, the candidate of the Democratic party for the office of mayor of the city of Utica at the general election of November 2, 1915, to restrain the board of county canvassers of the county of Oneida from opening, pursuant to a resolution of such board adopted December 22, 1915, certain voting machines used at such election in such city, upon the ground that such board had no jurisdiction in the premises to take such action or to open or cause to be opened such voting machines. The alleged proceeding, according to the contention of the applicant, is based upon section 433 of the Election Law (Consol. Laws, c. 17). A temporary injunction to prevent such opening has been granted, and this is a hearing upon a motion to dissolve the temporary injunction.

John G. Thomas, the Republican candidate for such office at such election, Egburt E. Woodbury, Attorney General of the state of New York, and Louis M. Martin, a candidate for the office of assemblyman, in the Second district of Oneida county at such election, the Seventh, Twelfth, and Fifteenth wards of the city of Utica being part of such assembly district, were permitted to intervene in the alleged proceeding.

When the temporary injunction herein was served, it was charged that the board of canvassers was about to open the voting machines in 23 election districts of the city of Utica, upon the claim that the returns from those districts revealed discrepancies justifying such opening under section 416 of the Election Law. I shall refer to the alleged discrepancies, not classifying them as to their nature, but by wards and districts in their numerical order.

### First Ward.

*First District.*—In favor of question No. 1: Return shows 52 votes; tally sheet shows 62 votes.

Comptroller: For Snyder, return shows 114 votes; tally sheet shows 119 votes.

For Burke, return shows 96 votes; tally sheet shows 89 votes.

City treasurer: For Redmond, return shows 118 votes; tally sheet shows 114 votes.

For Devereux, return shows 90 votes; tally sheet shows 96 votes.

President of common council: For Dickinson, return shows 125 votes; tally sheet shows 118 votes.

For Ballou, return shows 89 votes; tally sheet shows 90 votes.

Assessor: For Arthur, return shows 113 votes; tally sheet shows 125 votes. For Giersbach, return shows 94 votes; tally sheet shows 89 votes.

Public counter vote not shown on returns.

### Second Ward.

*First District.*—Tally sheet and return totals incorrect. Inspectors of election and poll clerks did not sign tally sheet. Discrepancy between tally sheet and return on question No. 1.

*Second District.*—In favor of question No. 1: Return shows 154 votes; tally sheet shows 153 votes.

In favor of question No. 2: Return shows 157 votes; tally sheet shows 200 votes.

In favor of question No. 3: Return shows 166 votes; tally sheet shows 167 votes.

## Third Ward.

*First District.*—Public counter vote not shown on returns.

*Second District.*—In favor of question No. 1: Return shows 154 votes; tally sheet shows 153 votes.

## Fourth Ward.

*First District.*—Figures on amendments, so called, and propositions or questions, so called, on tally sheets and returns, disagree. Public counter vote not shown on returns.

*Second District.*—Public counter vote not shown on returns.

## Fifth Ward.

*First District.*—Public counter vote not shown on returns.

## Sixth Ward.

*First District.*—Tally sheet signed by proper officers, but marked, "Second Ward First District."

*Second District.*—Claim that votes for supervisor were incorrectly footed. Already corrected.

## Seventh Ward.

*First District.*—No tally sheet returned.

*Second District.*—No vote for alderman on either 17—E or 17—G.

*Third District.*—Error in footing on city judge. Same already corrected.

Upon amendment No. 1: Return shows 370 votes counted, of which 268 were in favor and 102 against the amendment.

Upon amendment No. 2: Return shows 10 votes cast only.

Upon proposition No. 1: Return shows only 4 votes cast.

Upon local proposition No. 1: Return shows only 4 votes cast.

*Fourth District.*—In favor of amendment No. 2: Return shows 266 votes; tally sheet shows 226 votes. Public counter vote not shown on returns.

## Eighth Ward.

*First District.*—No tally sheet. Public counter vote not shown on returns.

*Third District.*—Member of Assembly: For Chase, return shows 181 votes; tally sheet shows 188 votes.

*Fourth District.*—Mayor: For Thomas, return shows 142 votes; tally sheet shows 150 votes. Public counter vote not shown on returns.

## Ninth Ward.

*Second District.*—440 votes registered on protective counter and 439 votes on public counter.

*Third District.*—Justice of the peace: For Risley, return shows 3 votes, tally sheet shows 2 votes.

*Fourth District.*—Coroner: For 3—G, return shows 3 votes; tally sheet shows 15 votes.

Comptroller: For 5—E, return shows 5 votes; tally sheet shows 2 votes. Public counter vote not shown on returns.

## Tenth Ward.

*First District.*—Public counter not shown on returns.

## Eleventh Ward.

*First District.*—Question No. 3: Return shows 256 votes against; tally sheet shows 200 votes against.

*Second District.*—Question No. 2: Return shows 236 votes for; tally sheet shows 230 votes for.

Local proposition No. 1: Return shows 91 against; tally sheet shows no votes against.

Protective counter shows 453 votes cast; public counter shows 451 votes cast.

## Twelfth Ward.

*First District.*—Question No. 2: Return shows 249 for and 196 against; tally sheet shows 196 for and 249 against.

*Second District.*—Public counter vote not shown on returns.

*Third District.*—Protective counter shows "000"; public counter shows "291."

## Thirteenth Ward.

*First District.*—No return sheet on questions.

*Third District.*—Protective counter shows 369 votes cast; public counter shows 368 votes cast.

## Fourteenth Ward.

*First District.*—Question No. 3: Return shows 309 votes against; tally sheet shows 307 votes against.

Justice of the peace: For Arthur, return shows 220 votes; tally sheet shows 222 votes.

Commissioner of common schools: For Maxson, return shows 116 votes; tally sheet shows 16 votes.

*Second District.*—Protective counter shows 472 votes; public counter shows 491 votes.

## Fifteenth Ward.

*First District.*—Tally sheet shows no record of votes upon proposition No. 1 (Barge Canal issue). Only two inspectors signed returns. Public counter vote not shown on returns.

*Second District.*—No record of public counter vote. No tally sheet returned.

*Third District.*—Constable: For William H. Loftus, return shows 338 votes; tally sheet shows 138 votes.

I have omitted from the foregoing some of the claims of the board of canvassers which I do not deem of sufficient importance to consider.

Upon the voting machines in Utica there are no protective counters, but I cannot say that the return of a vote upon the protective counter may not involve a discrepancy.

Upon the voting machines there were five propositions or questions submitted. Two of these involved proposed amendments to the Constitution and are designated "Amendment No. 1" and "Amendment No. 2" on the so-called ballot, and in their order were at the head of the list. Then followed the proposition to issue the Barge Canal bonds designated "Proposition No. 1," and at the bottom of the list was a proposition to acquire a suitable site for a city hall, designated "Local Proposition No. 1."

There may be some confusion in the foregoing statement as to these amendments, propositions, or questions upon which some light may be thrown by the foregoing explanation.

George C. Morehouse, Warnick J. Kernan, and Daniel E. Meegan, all of Utica, for James D. Smith.

H. J. Cookinham, Jr., of Utica, for Board of Canvassers of Oneida County.

Edward A. Gifford, Deputy Atty. Gen., for the Attorney General.

Richard R. Martin, L. N. Southworth, Seward A. Miller, and A. G. Senior, all of Utica, for John G. Thomas.

Louis M. Martin, of Clinton, in pro. per.

DE ANGELIS, J. While most of the alleged discrepancies have no direct bearing upon the controversy between the Democratic and Republican candidates for the office of mayor, the board of county canvassers take the position that they are sworn officers of the law, and that they have the right, and it is their sworn duty, to obtain cor-

rections in the returns submitted to them, whatever office or proposition may be involved, to the end that they may perform their statutory duty. In that respect I do not think their attitude can be successfully assailed.

[1] The precise question involved is the extent of the power of the board of county canvassers under section 416 of the Election Law.

The heading and first sentence of that section need careful consideration, and are as follow:

*"Provision for Re-Canvass of Vote.* Whenever it shall appear that there is a discrepancy in the returns of any election district, the county board of canvassers shall summon the inspectors of election thereof and said inspectors shall, in the presence of said board of canvassers, or a bipartisan committee thereof, make a record of the number on the seal and the number of the protective counter, if one is provided, open the counter compartment of said machine, and without unlocking said machine against voting, shall recanvass the vote cast thereon."

What does "discrepancy" mean? What office was it designed to fill in this legislation?

The word "discrepancy" is derived from a well-known Latin verb (discrepare) signifying to differ in sound, to sound differently or discordantly, applicable originally to sounds in the physical world. In process of time the word acquired a broader meaning and came to be applied to things generally that differed, did not agree, were not in harmony. Thence came the noun "discrepancy," synonyms of which are discord, discordance, dissonance, dissidence, unconformity, disagreement, difference. A discrepancy might exist between two existing things or two existing numbers that ought to agree, or between an existing thing which fails to conform to a given standard and the standard. The statute requires the certificate made by the district inspectors to conform to a given standard. Where an alleged return does not conform to what the statute requires, there is a discrepancy between it and the statutory requirement. In such a case there is a discrepancy in the return, a lack of conformity, unconformity.

This word "discrepancy" crept into the legislation creating section 416 of the Election Law, as it now exists, through an amendment to chapter 909 of the Laws of 1896 contained in chapter 491 of the Laws of 1908 in which act section 179b was added to section 179 of the act of 1896. That was a new provision applicable to voting machines alone and is now retained in its exact wording as originally adopted. It seems to me reasonably clear that the design of the Legislature in adopting the amendment of 1908 was to furnish a method for the correction of errors in election returns in voting machine districts sufficient to cover all such errors susceptible of correction, and that the word "discrepancy" was not used in a narrow sense, but in such a sense as to justify certainly as much relief in cases of errors in voting machine districts as has been afforded for nearly 75 years in cases of errors in districts where there has been voting by ballot. If this is not true, why was the amendment of 1908 adopted? Every defect in returns whose correction is provided for in districts where voting is by ballot (section 432 of the present Election Law) involves a discrepancy. Why should it be necessary to summon the district elec-

tion officers before the county board of canvassers twice, once under section 432 and again under section 416? The original of section 432 was section 15 of article 1 of title 5 of chapter 130 of the Laws of 1842. Voting machines were not thought of in 1842. In all the changes and revisions of the Election Law down to 1892 that provision remained unchanged. Slight changes were made in this provision by section 132 of chapter 680 of the Laws of 1892 and in section 132 of chapter 909 of the Laws of 1896. This provision became section 432 of chapter 22 of the Laws of 1909 (the present Election Law) which was slightly amended by chapter 821 of the Laws of 1913.

It was argued on behalf of the applicant for the injunction that, if there was any difference between the figures shown in the returns and tally sheets, the returns must govern, and People ex rel. Noyes v. Board of Canvassers, 126 N. Y. 392, 27 N. E. 792, was cited as authority for the proposition. That was not a voting machine case, but a ballot case, and there the Court of Appeals decided that there was a distinction between the certified statement of the canvass of the district election officers and the attached statement and ballots for different candidates, and held that the certified statement, often referred to as the return, was the conclusive evidence of the canvass, and the attached statement and ballots were simply exhibits. That case was decided in June, 1891, and at the following session the Legislature in express terms provided that the ballots so attached with such statements should be deemed a part of the certified statement of the canvass by the inspectors or district canvassers. Chapter 680 of the Laws of 1892, § 115. Thereby the authority of the Noyes Case was swept away. In the present Election Law the tally sheet is to be treated as part of the return. Section 373. In Matter of Stewart, 155 N. Y. 545, 50 N. E. 51, the importance of the tally sheet is pointed out. There the court said that in case of a discrepancy the tally sheet should control under the Election Law of 1896. Under the present law I think the tally sheet and the return are both originals, because, although the tally sheet must be completed first, the safeguards for its accuracy are not greater than the safeguards for the accuracy of the return.

I have not the time to describe the operation of the voting machines used in Utica at the last general election, but I am satisfied that, properly used, they are reasonably accurate. They involve the mechanism of the cash register and the adding machine. They are wonderfully safeguarded against fraud and mistake. The suggestion is made that because the voting machines, since the moment the election district officers completed their canvasses have not been under the surveillance of a squad of policemen, they have been tampered with. Whether these machines were closely watched, or not watched at all, they were reasonably guarded by the seals, locks, and other devices. It is true that an expert manipulator of one of these machines, who in his person constituted a skillful burglar, might change a vote on one of these machines; but it seems to me that such an operation is too remote seriously to be considered. It overlooks the seals and the locks and the fact that eight or more persons are present at the canvass when the counter compartment of the machine is opened where everything is

done in the presence of those eight persons, every portion of the counter compartment visible and easily seen, figures called off, figures put down, and every transaction as open as daylight. Suppose that after that canvass it should turn out that upon a recanvass a hundred votes had been taken from one candidate and given to the other, a person seeking to profit from that condition of things would be confronted by those eight men, some of whom might have frail memories, some of whom might be dishonest, but there would exist the figures that they had made. Rumors of tampering with voting machines are easily spread and are generally the product of the heated imagination of interested parties.

For years ballots were destroyed immediately after the district canvass was completed; indeed, this was substantially so from 1822 to 1896. From 1822 to 1842 both the ballots and the pollbooks were destroyed. The act of 1842 required the poll lists or pollbooks to be preserved. It was not till 1896 that the law required the unprotested voted ballots to be preserved. The trend of modern legislation and of modern judicial opinion, however, is in favor of some inquiry beyond the bare returns of district election officers. Sections 374, 414, 416, and 433 of the Election Law, and People ex rel. McLaughlin v. Ammenwerth, 197 N. Y. 340, 90 N. E. 973. At the same time such inquiry should not go so far as to create public embarrassment by failure speedily to have made known the result of an election. Theoretically one candidate will fill an office as well as another, and the public business should not be embarrassed by extended delays in the canvassing of election returns.

Whatever may be the result of the work of the board of county canvassers, that result might be swept away in an action in the nature of quo warranto brought by the unsuccessful candidate against the candidate who succeeds for the time being by the action of the board of canvassers.

[2] I think the county board of canvassers is a ministerial body and has no judicial power. At the same time, I think it is right in seeking to get much of the information which has been denied to it by the injunction herein. Indeed, the propriety of the injunction is so much in doubt, I have concluded to dissolve it. But in doing this I shall indicate my views as to what the county board of canvassers may do in the premises. I think both the district canvassers and the county canvassers are absolutely bound by what the counter compartments of the voting machines show. If a discrepancy, as I have defined it, can be cleared up without unlocking a machine, the machine should not be unlocked. If, after an inspection of the public counter, a discrepancy still exists, then the counter compartment may be unlocked without unlocking the machine against voting. If the discrepancy still exists after getting all the light the counter compartment discloses, then the county canvassers under the direction of the statute may unlock the voting and counting mechanism of the machine and the same may be tested.

I think the voting machines in the following districts may be unlocked if found necessary under the foregoing rulings:

First ward: First district.
Second ward: First and Second districts.
Third ward: First and Second districts.
Fourth ward: First and Second districts.
Fifth ward: First district.
Seventh ward: First and Fourth districts.
Eighth ward: First district, Third district, and Fourth district.
Ninth ward: Second, Third, and Fourth districts.
Tenth ward: First district.
Eleventh ward: First and Second districts.
Twelfth ward: First, Second, and Third districts.
Thirteenth ward: First and Third districts.
Fourteenth ward: First and Second districts.
Fifteenth ward: First, Second, and Third districts.

I do not mean by the foregoing to limit the board of canvassers as to any further discrepancies that may appear as its work proceeds.

This opinion has been very hastily prepared because the public exigency seems to demand immediate action.

An order may be entered dissolving the injunction, but without costs.

Ordered accordingly.