In the Matter of the Application of JAMES J. BARRETT for an
   Examination of Voting Machines and Absentee Ballots, Pur-
   suant to the Provisions of Section 333 of the Election Law.

Supreme Court, Onondaga Special Term, December, 1923.

**Elections — voting machines — Election Law, section 333, does not permit
courts to arbitrarily order voting machines to be opened and examined —
when candidate for office is not in position to commence action of
quo warranto — order denied in exercise of judicial discretion — who
may appear.**

The legislature never intended by section 333 of the Election Law to give the
   court authority to arbitrarily or capriciously order voting machines to be opened
   and examined. In view of section 266 of the Election Law which author-
   izes the board of canvassers to summon the inspectors of election whenever it
   appears that there is a discrepancy in the return of any election district, and
   have them open the counter compartment of a voting machine, if necessary,
   and recanvass the vote cast thereon, said section 333 is surplusage unless it
   was intended thereby to preserve evidence for some candidate who had com-
   menced or was about to commence a quo warranto action.
Petitioner was a candidate for the office of president of the common council of the
   city of Syracuse at the general election held in November, 1923, and while the
   board of canvassers was still in session and not having completed their canvass
   or made an official statement of the result of the vote for the office in question,
   the petitioner made a motion under section 333 of the Election Law for an order
   permitting him to examine voting machines and absentee votes cast therein.
   *Held*, that the petitioner was not presently in a position to commence an action
   of quo warranto to try the title to the said office, which action must be brought
   in the name of the people of the state by consent of the attorney-general, and
   the motion must be denied for want of power.
The petitioner made no charge of fraud in any election district and no suggestion
   of error or mistake in eighty-nine of the one hundred and twenty-six election
   districts of the city, but complained of irregularities or discrepancies in the
   remaining districts, in only ten of which there appeared to be any serious irreg-
   ularity or discrepancy. *Held*, that even if the denial of the motion on the
   ground stated be erroneous the order asked for should be denied in the exercise
   of judicial discretion, but without prejudice to the pursuit of any other remedy
   as the petitioner may deem proper.
In a proceeding which questions the right of any candidate to an office to which
   he apparently was elected the party which nominated that candidate should
   not be denied the right to be heard, and under section 335 of the Election Law
   giving the court the right in all judicial proceedings taken under the Election
   Law to require notice to be given to such persons or committees as the court
   might direct, one of the commissioners of election and the county committee of
   the party of which the petitioner is not a member will be allowed to appear upon
   the present motion.

MOTION by petitioner for an order permitting him to examine
voting machines.

*James J. Barrett*, in person, for motion.

Supreme Court, December, 1923.     [Vol. 121

*Ray B. Smith,* for Charles G. Hanna, opposed.

*Edmund H. Lewis,* for Republican County Committee of Onondaga county, opposed.

*Nathan Abelson,* for Alex. Carlson, one of the commissioners of election of Onondaga county, opposed.

EDGCOMB, J. At the recent election James J. Barrett, the petitioner, was the Democratic candidate for president of the common council of the city of Syracuse, and Charles G. Hanna was his opponent upon the Republican ticket. While the board of canvassers are still in session, and have not completed their canvass or made an official statement of the result of the vote for the office in question, an addition of the votes in the various election districts, as shown by the returns filed with the commissioners of election, shows that Mr. Hanna received 26,208 votes, and Judge Barrett 26,166. Apparently Mr. Hanna is elected by the narrow margin of forty-two majority.

Petitioner questions the accuracy of these figures, and asks that he be allowed to examine the voting machines used in the city of Syracuse at the recent election, and all the absentee votes cast therein.

Petitioner objects to the appearance of Mr. Carlson, one of the commissioners of election, and of the Republican county committee, in opposition to his motion. Mr. Carlson was a party to the proceeding; he was served with the notice of motion. Surely he could not be denied the right to be heard. Under our system of party government the party organization invariably takes charge of and conducts the campaign on behalf of its candidates, and is keenly interested in their success. In a proceeding which questions the right of any candidate to an office to which he apparently was elected, I think it safely can be said that the party which nominated that candidate is interested in the result, and should not be denied the right to be heard. The legislature has recognized such interest, and has given the court the right in all judicial proceedings taken under the Election Law to require notice to be given to such persons or committees as the court might direct. Election Law, § 335. I, therefore, deem it proper to allow both Mr. Carlson and the Republican county committee to appear on this motion.

All right-minded citizens will agree that no man should be allowed to take an office to which he was not elected. Knowing these candidates as I do, I am very sure that both hold such view. An election is the embodiment of the popular will. Ours is a country where the will of the majority as expressed on election day

is supreme. At first blush it might be urged that inasmuch as the result is so close, an examination of the machines should be had in the interest of fair play. Mature deliberation, however, raises doubt as to the necessity or wisdom of such course.

The cost to the county attendant upon the opening of these machines would amount to a considerable sum, but that should not be seriously considered, if the will of the majority of the people as expressed at the polls is in danger of being set aside.

The Election Law throws every possible safeguard about the canvass of the vote, and the proclamation of the result. The election is conducted by a bi-partisan board. Watchers representing both parties are present at the count. After the voting machine is closed and locked, the counter compartment is examined in the presence of the watchers and all other persons lawfully in the polling place. The chairman of the board, under the scrutiny of an inspector of a different political faith, announces the result of the vote of each candidate as shown by the counter numbers. If he should inadvertently make a mistake there is a man of the opposing party at his elbow to correct the error. Watchers of both parties also examine the figures in the counter compartment. The proclamation of the result of the votes cast is deliberately announced by the chairman of the board. He reads the name of each candidate with the designating number, and the letter of his counter, and the vote registered on such counter. During such proclamation ample opportunity is given to any person lawfully present to compare the result so announced with the counter tallies of the machine, and any necessary corrections can then and there be made by the board. The counter compartment is kept open until the official returns have been fully completed and verified. During all this time any candidate or watcher who may desire is at liberty to examine the counter numbers. The vote is taken down by two inspectors of opposite political faith from each other, and the returns are filled out and certified by all the inspectors. After all this is done the machine is closed and locked. A signed statement, showing the number of votes received for each candidate, is delivered to the police officer on duty at the polling place, and filed by him in the police office. One original return is filed with the commissioners of election, and another with the city clerk. With all these precautions the rights of the various candidates are well protected, and it is difficult to see how error could creep into the results as announced. However, mistakes sometimes occur. The human element is always present. When one considers all the precautions taken to safeguard the counting and recording of

the vote the necessity of a further examination of the machines does not appear to be as imperative as it might to the man on the street.

It must also be remembered that public interest demands a speedy as well as an accurate determination of the result of an election. Any system which permits the results to be held up indefinitely, while an apparently defeated candidate goes behind the returns, and examines and re-examines the ballots or machines in an endeavor to find some evidence upon which he may base a contest, would inflame the public mind, and create a condition which might easily be fraught with great danger to the country. I borrow the words of Chief Judge Parker, in *People ex rel. Brink* v. *Way,* 179 N. Y. 174, 181: " Occasions have arisen, and will again arise, where the necessity for a speedy disposition of the question of which candidate is entitled to the office is of far more importance than whether the person elected shall lose it." Every provision of the Election Law has upon it an impress imposing upon election officers and boards a speedy determination of the vote. Wholesale orders by the courts permitting the opening of machines and ballot boxes would upset the whole system adopted by law for the conduct of elections. If it should be done in a city, then the same rule would apply to the county, and to the entire state. The mere mention of such a situation brings to mind immediately the possibilities of confusion, disturbance, tumult, fraud and possible crime.

Therefore, this application cannot be decided upon mere sentiment for fair play, or upon a desire to be doubly sure that no error has crept into the face of the returns. A decision upon such altruistic grounds would establish a dangerous precedent. Has the court the power to order these machines opened and examined? If so, when and under what circumstances should this power be exercised?

The Constitution of the state, as well as the statute itself, has wisely put the conduct of elections in the hands of a bi-partisan board. The judiciary is prevented from interfering with the ministerial duties of election officers. *People ex rel. Brink* v. *Way, supra; Matter of Hearst* v. *Woelper,* 183 N. Y. 274; N. Y. Const. art. 2, § 6. In the absence of statutory authority the court has no power to order a voting machine or a ballot box opened. *Matter of Thomas,* 216 N. Y. 426.

Petitioner bases his right to relief upon the provisions of section 333 of the Election Law. This section reads as follows: " The supreme court or a justice thereof may direct the examination by any candidate or his agent of any ballot or voting machine upon

which his name appeared, and the preservation of any ballots in view of a prospective contest, upon such conditions as may be proper."

While this section is general in its terms, what has already been said shows that the legislature never intended to give to the court authority to arbitrarily or capriciously order voting machines to be opened and examined. The statute should not be given such a construction. *People ex rel. Brink* v. *Way, supra; Matter of Whitman,* 185 App. Div. 228, 233.

The purpose of this section was to preserve evidence for some candidate, who had commenced or was about to commence an action in the nature of a quo warranto to contest the right of his opponent to an office. This is evident from the last part of the provision which provides for " the preservation of any ballots in view of a prospective contest." The section is a part of article 14, which pertains to judicial proceedings. This purpose is also apparent if we turn to the article pertaining to voting machines, and examine section 266, where we will find a provision authorizing the board of canvassers to summon the inspectors of election, whenever it appears that there is a discrepancy in the returns of any election district, and have them open the counter compartment of the machine, if necessary, and recanvass the vote cast thereon. This provision is mandatory on the part of the board of canvassers and the inspectors of election. The court does not instigate this proceeding, and has no part therein. If the board should arbitrarily refuse to do its duty, mandamus would lie. In view of section 266, section 333 is surplusage unless it was intended thereby to preserve evidence for some candidate who had commenced or was about to commence a quo warranto action.

Before 1896 all ballots used at an election were destroyed immediately. Section 111 of the Election Law, enacted in that year, provided that all ballots voted, with the exception of those which were void or protested, should be preserved inviolate for six months after the election, and that the boxes might be opened and the ballots examined upon an order of the Supreme Court, or a justice thereof, or a county judge. The section merely permitted an examination of the ballots; it did not authorize a recanvass or a recount. The similarity of that section and section 333 of the present law is very striking. It was held in *Matter of Election of Member of Assembly,* 18 Misc. Rep. 391, that under the provisions of the statute of 1896, a ballot box could not be opened except for the purpose of aiding a criminal prosecution, or in a civil action or proceeding where the court could make a decision binding upon the parties and the public.

Supreme Court, December, 1923.                    [Vol. 121

It was held in *Matter of Whitman, No. 2,* 225 N. Y. 21, that the court might properly withhold the right of a candidate to examine the ballots used at an election, under section 374 of the former Election Law, which is one of the sources of section 333 of the present act, until after the canvass of all votes had been completed.

Judge Pound, writing for the Court of Appeals, in *Matter of Smith* v. *Wenzel,* 216 N. Y. 421, says (p. 425): " Doubtless it is a safe and sound practice to distinguish carefully between a recount and recanvass of ballots and an examination thereof merely to preserve evidence for use in an action in the nature of quo warranto to try title to public office, and thereby to sustain the underlying principle of the Election Law which prevents the courts from reviewing the ministerial work of inspectors and canvassers in counting and canvassing votes."

If I am right in my conclusions, section 333 does not give the court authority to order the machines opened at this time. No action or proceeding is pending to try the title to said office. Petitioner is not in a position to commence such an action, because no such action can be commenced until some one actually has title to the office. No official announcement of the election has been made, and no certificate of election has been issued. The only way the determination of that board can be reviewed is by a quo warranto proceeding, in which the questions of fact must be determined by a jury. Such an action cannot be brought by the petitioner; it must be brought in the name of the People of the state. *Matter of Metz* v. *Maddox,* 189 N. Y. 460. It cannot be brought without the consent of the attorney-general. He may arbitrarily refuse to give such permission. Therefore, petitioner is not in a position at this time to make this application under section 333.

Even if I am wrong in my conclusions already reached, I do not believe that petitioner is entitled to an order permitting him to examine all the machines used in the recent election in Syracuse. Concededly the right to such examination rests in the sound discretion of the court. Leave to make a promiscuous or arbitrary examination of the machines, without good cause shown, would be an abuse of discretion. This brings us to a discussion of the reasons why petitioner thinks that he should be afforded the relief asked.

Syracuse has nineteen wards, and one hundred and twenty-six election districts. The petitioner complains of irregularities or discrepancies in thirty-seven districts, and makes no suggestion of any error or mistake in any of the other eighty-nine districts. There is no claim of fraud in any district.

The alleged discrepancies or irregularities complained of may be classified as follows:

1. That there are more blank ballots for the office in question than the petitioner thinks were actually cast.

2. That the official returns differ in certain instances from those published in the daily papers.

3. That certain returns are written in pencil rather than ink.

4. That absentee ballots in one district were not properly distributed.

5. That the inspectors in one district made arbitrary additions to the vote of both candidates, equal in number to each candidate.

6. That in certain of the districts the total number of votes cast for the office of president of the common council is not given.

7. That certain returns are not properly certified.

8. That discrepancies exist in certain districts between the returns filed with the board of canvassers, the city clerk and the police department.

9. That the figures in certain returns are illegible.

We may summarily dismiss the suggestion that there are more blank ballots than petitioner thinks there should be. At best that is a mere surmise or speculation on the part of the petitioner, without any basis therefor. As indicative of the reliance to be put upon petitioner's conjecture it might not be out of place to call attention to the fact that the official returns of the election held in Syracuse two years ago, when petitioner was a candidate for, and was elected to the same office for which he was a candidate at the recent election, show that there were 4,312 blank votes cast for president of the common council. Petitioner alleges that there were approximately 4,500 blank votes cast at the recent election. Voting machines always show a considerable number of blank votes for every office.

Of course the official returns differ from the figures published in the newspapers on election night and the following day. No one ever knew the vote as published by the papers to coincide exactly with the official vote. In the hustle of the press to get the results, and in the haste with which their blanks are filled out by any one who happens to be handy before the result is formally announced, and the subsequent haste of getting out the various editions, it is not surprising that errors creep into the published figures. The only surprise is that the press is able to give the results as accurately as they do. The slight discrepancies here shown are not entitled to consideration.

The Election Law requires the returns to be filled in in ink.

That a pencil was used in certain instances does not affect the accuracy of the figures.

It is alleged upon information and belief that in one district four absentee votes were not properly distributed, but it is not stated in what particular. No proof is offered to substantiate petitioner's belief. Such an allegation is insufficient to warrant a court to act in a matter of this kind.

It is claimed that in the third district of the eleventh ward there were seventeen absentee votes cast, and that the whole number were arbitrarily added to the vote of all candidates on both the Republican and Democratic tickets. Mr. Carlson's affidavit shows that these figures were disregarded in canvassing the returns, and that there were no absentee ballots delivered to the inspectors of election in said district. This objection would not seem to demand the opening of the machine in that district. If it be found that Mr. Carlson's statement is incorrect, the error could doubtless be taken care of in another way.

The fact that certain returns were not properly certified is insufficient to warrant the opening of the machines in those districts. The inspectors should be called in to rectify their mistake.

The objection that the whole number of votes cast was not inserted in the returns in certain of the districts is entitled to serious consideration. Without this information it is impossible to determine from the returns whether the total votes credited to each of the candidates for said office in such districts exceed the total votes cast as recorded on the machine. The affidavit of Mr. Carlson, one of the commissioners of election, states that a count of the signatures of the voters in these districts contained in the general election poll book shows that the whole number of votes cast for president of the common council exceeded the total vote given to the petitioner and his opponent. While that method of determining the total votes cast in any district is probably accurate, it may possibly be open to some criticism.

The objection that the figures in certain of the returns are blurred and illegible reveals a condition which I think should be cleared up. Likewise any discrepancies in the vote of petitioner or his opponent, as shown by the returns filed with the police department and the commissioners of election, constitute an objection entitled to serious consideration.

The moving papers disclose but six districts in which there appear to be any actual discrepancies between the returns filed with the police department, city clerk or board of canvassers, and four districts in which the figures in the return are illegible.

This makes only ten districts in which there is a complaint of any serious irregularity, or discrepancy. Discrepancies or uncertainty in ten districts would not warrant the court in ordering the machines in the other one hundred and sixteen districts opened, even if the section in question gave the court the power so to do.

It is clear that the court has no authority to grant the relief asked for, and that the motion must be denied.

This opinion might well stop here. However, owing to the importance of this matter and the likelihood of it coming before the board of canvassers in another form, and the need for speedy action, I feel justified in going farther, and outlining a method of procedure, even though these questions are not before me, and what I say is *obiter dictum.*

I believe that petitioner is not without relief, but that he has mistaken his remedy. He may demand of the county board of canvassers that they proceed under section 266 of the Election Law, and call in the inspectors in those districts where there are discrepancies in the returns, and have them correct the errors and supply the omissions, and when necessary open the machines and recanvass the votes.

That section is broad enough to cover this situation. All of the complaints alleged in the moving papers are discrepancies within the meaning of that term as there used. *Smith* v. *Board of Canvassers*, 92 Misc. Rep. 607. They involve matters within the powers and duties of the board of county canvassers as defined by the Election Law. Under this section all this work would be done by the ministerial boards charged by the law with the duty of conducting elections and canvassing the vote.

That board is still in session. I have no doubt but what they will promptly and willingly perform their duty. If not mandamus will lie to compel them so to do.

Petitioner calls attention to the last sentence of section 266, which reads as follows: " However, nothing contained in this section shall authorize any change in the returns filed by inspectors of election in any election district nor authorize any board of canvassers in any wise to consider or act upon any recanvass of votes made pursuant thereto." Petitioner urges that any information obtained from an examination of the machines under the provisions of that section would be unavailing because he could not avail himself of any evidence thus found on account of the prohibition above quoted. This provision is new, and when casually read may cause some confusion. If petitioner proceeds under section 266 he is in no different position than he would be if the machines were to be opened by order of the court. He cannot

have a recount or recanvass under section 333. He can get the same information whether the machines are opened under section 266 or 333. The last sentence of section 266 does not deprive the petitioner of taking advantage of any error in the returns which may be discovered by an inspection of the machines. The court has inherent power, independent of the Election Law, to compel inspectors to make a true return, and to perform their clear duty. *Matter of Smith* v. *Wenzel*, 216 N. Y. 421, 425; *Matter of Stewart*, 155 id. 545; *People ex rel. McLaughlin* v. *Ammenwerth*, 197 id. 340; *People ex rel. Henness* v. *Douglass*, 142 App. Div. 224. This sentence in question uses the words " this section " and not " this act." Section 266 does not provide a remedy, but with the information obtained through the relief afforded by that section, petitioner is still at liberty to pursue the remedy given in any other section of the act. This is pointed out as to ballots in *Matter of Weinfeld*, 203 App. Div. 778.

It may not be out of place for me to suggest what, in my opinion, the board of canvassers should do, if application is made to them under section 266, and in fact what I believe they should do on their own motion, now that their attention has indirectly been called to certain irregularities.

The board of canvassers should summon the inspectors of election of the various districts, where the returns are not properly certified, so that they may make the proper certificate.

In those districts where the returns do not show the total number of votes cast for the office of president of the common council, the inspectors should be summoned before the board, and be required to insert that number in the return. That can easily be done by looking at the public counter on the machine and adding to the number shown thereon the number of absentee votes cast in the district. The number of absentee votes in each district is on file in the office of the board of elections. The public counter on the machine can be examined without much work. It will not be necessary to open the counter compartment.

In those districts where the figures on the returns are blurred and illegible, or where there are discrepancies between the returns filed with the board of canvassers, the city clerk and the police department, and in any district in which the public counter has been examined and the total number of votes cast exceeds the sum total of votes cast for the various candidates for president of the common council, as shown by said returns, the inspectors of election should be summoned before the board of canvassers, and said inspectors in the presence of said board of canvassers, or a bi-partisan committee thereof, should open the counter com-

partment of such machine, and without unlocking the machine against voting, should recanvass the vote cast thereon. Before making such recanvass the board of canvassers should give notice in writing to the voting machine custodian, to the chairman of each party and to Judge Barrett and Mr. Hanna of the time and place where such recanvass is to be made. The board should see to it that all the provisions of section 266 of the Election Law are fully complied with.

I appreciate that the above suggestions are not binding here. They are made, however, in the belief and hope that they may be of some value to the county board of canvassers. If that hope proves to be true, they have not been made in vain.

Motion denied, without costs, and without prejudice to the petitioner to pursue any other remedy which he may deem proper.

Ordered accordingly.